**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA**<br><br>**v.**<br><br>**SAID NASSOR,**<br><br>**Defendant.** | **Case No. 26-cr-86 (EGS)** |

# STATEMENT OF OFFENSE IN SUPPORT OF GUILTY PLEA

## I. Summary of the Plea Agreement

As set forth in the attached plea agreement, Defendant Said Nassor (hereinafter referred to as "Defendant" or "NASSOR") agrees to accept responsibility and plead guilty to Count One of the Information, charging Defendant with Conspiracy to Commit Health Care Fraud in violation of Title 18, United States Code, Section 1349.

## II. Elements of the offense

The essential elements of the offense of Conspiracy to Commit Health Care Fraud, in violation of Title 18, United States Code, Section 1349, each of which the government must prove beyond a reasonable doubt to sustain a convition are:

*First*, the Defendant did knowingly and willfully, that is, with the intent to further the objects of the conspiracy, combine, conspire, confederate, and agree with each other and others, to execute, or attempt to execute, a scheme and artifice to defraud a health care benefit program affecting commerce, as defined in Title 18, United States Code, Section 24(b), that is, D.C. Medicaid, to obtain money or property owned by, or under the custody or control of D.C. Medicaid, by means of false or fraudulent pretenses, representations, or promises;

*Second*, the false or fraudulent pretenses, representations, or promises related to a material fact;

*Third*, the Defendant acted willfully and intended to defraud; and

*Fourth*, the Defendant did so in connection with the delivery of or payment for health-care benefits, items, or services.

III. Statement of Facts

Pursuant to Federal Rule of Criminal Procedure 11, the United States and the Defendant, with the concurrence of Defendant's attorney, stipulate and agree that the following facts are true and accurate. The following statement of facts does not purport to include all of the Defendant's illegal conduct. It also does not purport to be an inclusive recitation of everything that the Defendant heard, knew, or witnessed concerning the illegal activities committed by Defendant and others. It is intended to represent sufficient information for the Court to find a factual basis for accepting the Defendant's guilty plea.

**BACKGROUND**

**D.C. Medicaid and Behavioral Health Regulatory Framework**

1. Medicaid was a health insurance program established by Congress under Title XIX of the Social Security Act of 1965. In the District of Columbia, Medicaid was jointly funded by the federal and D.C. governments. Medicaid provided health insurance coverage to D.C. residents whose incomes were below a certain financial threshold. Recipients of medical services covered by Medicaid were referred to as "beneficiaries." Medicaid was a "health care benefit program" as defined in 18 U.S.C. § 24(b) and a "Federal health care program" as defined in 42 U.S.C. § 1320a-7b(f). Under Medicaid, only medically necessary services were authorized to be reimbursed.

2. In Washington, D.C., behavioral health services were administered by the D.C. Department of Behavioral Health ("DBH"). As the primary mental health authority in D.C., DBH was responsible for implementing and overseeing D.C.'s Mental Health Rehabilitative Services ("MHRS") program, a program covered by Medicaid. MHRS services were intended to assist eligible beneficiaries navigate and alleviate the impact of mental and behavioral health issues. Beneficiaries who received MHRS were often referred to as "consumers."

3. Under the MHRS program, Medicaid covered and reimbursed standard behavioral health services, such as Community Support services. Community Support services included, among other things, assistance and support for mental-health consumers in stressor situations, individual mental health interventions, assistance with increasing social support skills to enable consumers to ameliorate life stresses, and the development of mental health relapse prevention strategies. Community Support services were provided by a consumer's Community Support Worker ("CSW") under the auspices of a certified Medicaid Provider known as a Core Services Agency ("Provider").

4. Providers are required to maintain up-to-date records and to accurately document all MHRS encounters billed under the Provider's electronic medical records ("EMR") system. In D.C., Providers typically use an EMR platform called Credible. In order to be reimbursed by Medicaid for MHRS services provided to consumers, CSWs are required to document the service in Credible by inputting clinical encounter notes that included, among other information, consumer information, treatment notes, and dates and times of service. CSWs are authorized to conduct encounters in several ways, including by telephone. A "tele" visit indicated a telephonic or virtual encounter with a consumer. CSWs were required to validate the accuracy and authenticity of the services by signing their names electronically in Credible. Once a CSW submitted an encounter

note into Credible for reimbursement, Providers were required to review the notes for accuracy and approval prior to submission to Medicaid for reimbursement.

5. In Washington, D.C., MHRS encounters with consumers were billed in "units," which were equivalent to 15 minutes of time providing services to a consumer. Standard MHRS encounters, including Community Support services, were assigned billing code H0036 and reimbursed by Medicaid at a rate of $97.08 per hour. DBH regulations required the actual start and stop time of MHRS encounters to be used to calculate the duration of the service. For purposes of reimbursement, Medicaid authorized service encounters exceeding seven minutes to be rounded to the nearest whole unit.

6. Providers, as well as all employees of Providers, including CSWs, were required to know, understand, and follow all federal and local laws, including Medicaid rules and regulations applicable in Washington D.C.

**The Defendant, Relevant Entities, and Other Persons**

7. Quality Healthcare Services, LLC ("Quality") was a Medicaid Provider headquartered at 1818 New York Avenue, Suite 222, in Washington, D.C. At all relevant times, Quality was authorized to provide MHRS services to youth and adolescents who were Medicaid beneficiaries in the District of Columbia. At all relevant times, the services that Quality was authorized to provide included Diagnostic/Assessment, Medication/Somatic Treatment, Counseling and Psychotherapy, and Community Support, in accordance with Chapter A34 of Title 22 of the District of Columbia Code of Municipal Regulations. On September 14, 2020, Quality entered into a service agreement with the District of Columbia Department of Health Care Finance (DHCF) for Mental Health Clinic Services, Psychiatric Services, and Medicare Part B Services.

8. Defendant **SAID NASSOR** was a resident of Silver Spring, Maryland and, beginning in or about August 2022, was employed as a CSW by Quality.

9. Co-Conspirator 1 was a resident of Laurel, Maryland. Co-Conspirator 1 was listed as "Governor" on Quality's original Certificate of Organization and appeared to be the controlling executive of Quality who ran the day-to-day operation of the company. Co-Conspirator 1 exercised oversight over multiple CSWs (the "the CSW Co-Conspirators") and, among other things, instructed employees on how to document and bill for services. Co-Conspirator sometimes performed CSW services herself.

10. Co-Conspirator 2 was a resident of Brambleton, Virginia, and Co-Conspirator 1's daughter. Co-Conspirator 2 served as the Chief Operations Officer (COO) and Human Resources Director at Quality, and was listed as "owner primary contact" on company documents. Co-Conspirator 2 also performed CSW services at Quality. **SAID NASSOR** knew Co-Conspirator 2 as one of the executives at Quality.

11. Co-Conspirator 1, Co-Conspirator 2, **SAID NASSOR** and the CSW-Co-Conspirators submitted, or caused to be submitted, claims to Medicaid for reimbursement for MHRS services they allegedly performed.

**Conspiracy to Commit Healthcare Fraud**

12. From in or about January 2022 and continuing through at least February 2025, in the District of Columbia and elsewhere, Co-Conspirator 1 and the CSW Co-Conspirators, including **SAID NASSOR**, agreed and conspired to knowingly submit, or were willfully blind to the submission of, false and fraudulent MHRS clinical encounter notes to D.C. Medicaid for reimbursement, including MHRS encounter notes that grossly inflated the amount of time spent conducting services, or notes that were based on MHRS encounters that did not occur.

13. Co-Conspirator 1 instructed the CSW Co-Conspirators, including **SAID NASSOR**, to "make sure to use" all 600 units for a consumer—the total amount of units authorized by Medicaid for a consumer during a 180-day period—without regard to medical necessity and without regard to whether the services had actually been performed.

14. Co-Conspirator 1 instructed the CSW Co-Conspirators, including **SAID NASSOR**, to bill four units (one hour) for all MHRS telehealth encounters, regardless of how much time a CSW actually spent on the telephone with a consumer, and even if the call only lasted a few minutes. CSWs at Quality understood that billing all services for one hour was "the rule." To avoid scrutiny from DBH, the CSW Co-Conspirators were trained by Quality management, in the presence of Co-Conspirator 1, to offset the times that they billed in order to make the length of the phone call appear more realistic. For example, the CSW Co-conspirators were instructed to bill a telehealth encounter for 54 minutes, rather than 60 minutes every time.

15. Co-Conspirator 1 also directed the CSW Co-Conspirators, including **SAID NASSOR**, to take information learned during a single telehealth session and use it to create additional notes documenting false and fraudulent MHRS encounters. For example, if a CSW only spoke to a consumer on Monday, they were instructed by Co-Conspirator 1 to gain as much information as possible during that encounter. This allowed CSWs to spread out the information they learned and document additional hour-long telehealth sessions during the remainder of the week. As a result, Co-Conspirator 1 was aware, or was willfully blind to the fact that the CSW Co-Conspirators, including **SAID NASSOR**, submitted claims to Medcaid that sought payment for services that never occurred.

16. Co-Conspirator 1 also directed the CSW Co-Conspirators, including **SAID NASSOR,** to inflate the amount of time they billed for conducting diagnostic assessments (DAs). At first, Co-Conspirator 1 instituted a "rule" that employees bill all DAs for three hours, even if they did not speak with the consumer for that amount of time. Co-Conspirator 1 later changed the rule to one hour for all DAs.

17. Despite knowing that Medicaid required that encounter notes contain truthful and accurate information about services provided and the amount of time spent conducting a service, Co-Conspirator 1 and the CSW Co-Conspirators, including **SAID NASSOR**, knowingly and intentionally submitted, or were willfully blind to the submission of, fraudulent encounter notes to Medicaid for reimbursement.

**SAID NASSOR's Participation in the Conspiracy**

18. Throughout the course of the conspiracy, **SAID NASSOR** knowingly participated in a conspiracy to routinely submit fraudulent clinical notes for telehealth encounters that were grossly inflated or that did not occur. For example, from July 27, 2022 through June 23, 2023, **SAID NASSOR** documented over 701 *hours* of telehealth services across six patients when, according to call records, he only actually spent roughly 172 *minutes* with them on the telephone. (*See* Table 1).

**Table 1**

| Patient No. | Total Telemedicine Encounters No. | Amount Billed ($) | Amount Medicaid Paid ($) | Total Documented Hours (hours:min) | Total No. of Calls | Total Time of Calls (min:sec) |
|---|---|---|---|---|---|---|
| Patient So.H. | 117 | $14,680.77 | $13,993.11 | 139:41:00 | 18 | 35.88 |
| Patient Se.H. | 105 | $11,098.74 | $10,308.00 | 106:55:00 | 18 | 35.88 |
| Patient M.M. | 166 | $17,726.45 | $16,724.73 | 167:55:00 | 23 | 39.13 |
| Patient R.F. | 131 | $13,835.18 | $12,111.90 | 133:10:00 | 27 | 28.57 |
| Patient R.A. | 76 | $8,006.34 | $7,577.96 | 76:47:00 | 10 | 16.58 |
| Patient A.A. | 76 | $7,903.26 | $7,474.88 | 76:54:00 | 10 | 16.58 |

| | | | | | | |
|---|---|---|---|---|---|---|
| Totals | 671 | $73,250.74 | $68,190.58 | 701:22:00 | 106 | 172.62 |

19. Similarly, on October 21, 2024, **SAID NASSOR** created and billed for three telehealth encounters, to include one DA and two MHRS sessions, to patient Michelle Hallmon—an alias used by an undercover FBI employee. None of these telehealth encounters took place.

20. At the direction of Co-Conspirator 1, and in furtherance of the conspiracy, **SAID NASSOR** also used the illicit proceeds from Quality's Medicaid reimbursements to conduct financial transtractions for Co-Conspirator 1. On multiple occasions, Co-Conspirator 1 wrote **SAID NASSOR** checks from Quality's bank account, ranging from $10,000 to $45,000 in proceeds from the conspiracy. At the direction of Co-Conspirator 1, **SAID NASSOR** deposited theses checks into his bank account and then either transferred the funds back to Co-Conspirator 1, or converted the proceeds into cash, which he then remitted to Co-Conspirator 1.

**Loss Amount**

21. Based on the investigation to date and the government's analysis of relevant data to date, **SAID NASSOR's** participation in the conspiracy resulted in a loss to Medicaid of over $250,000.

**Limited Basis of Factual Proffer**

22. This factual proffer is a limited summary of defendant **SAID NASSOR's** conduct in connection with Count One of the Information to conspiracy to commit health care fraud, in violation of 18 U.S.C. § 1349, and is not intended to be a complete accounting of all facts and events that are known to the Government. The limited purpose of this Statement of Offense is to demonstrate that a factual basis exists to support the defendant's guilty plea in this case.

Respectfully submitted,

JEANINE FERRIS PIRRO
United States Attorney

By: ______________________________
Jason Facci (DC Bar 1027158)
Assistant United States Attorney
Fraud, Public Corruption, & Civil Rights Section
601 D. Street, NW
Washington, D.C. 20530
(202) 252-7742
Jason.Facco@usdoj.gov

Date: June 29, 2026

**Defendant's Acceptance**

I have read this Statement of the Offense word for word and carefully reviewed and discussed every word with my attorney. I am fully satisfied with the legal services provided by my attorney in connection with this Statement of the Offense and all matters relating to it. I fully understand this Statement of the Offense and voluntarily agree to it. No threats have been made to me, nor am I under the influence of anything that could impede my ability to understand this Statement of the Offense fully. No agreements, promises, understandings, or representations have been made with, to, or for me other than those set forth above.

8/25/26
Date

Said Nassor

**Defense Counsel's Acknowledgment**

I am Said Nassor's attorney. I have read this Statement of the Offense word for word and carefully reviewed and discussed every word with my client. It accurately and completely sets forth the Statement of the Offense agreed to by the defendant and the Office of the United States Attorney for the District of Columbia.

8/26/26
Date

Scott J. Krischke, Esquire
Attorney for Said Nassor